IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LAWRIE POWERS, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CV3016 |
| | ) | |
| V. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MEMORANDUM AND ORDER |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Lawrie Powers ("Powers") seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act and for the payment of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. After carefully reviewing the record, the Commissioner's decision will be affirmed.

I.   PROCEDURAL BACKGROUND

Powers applied for social security disability benefits on June 30, 2005, claiming alcohol and methamphetamine dependence, and psychiatric and psychological disorders rendered her disabled and unable to work since December 1, 2003.  Social Security Transcript ("TR") at 63, 70-76.  Her application for disability benefits was denied initially on August 24, 2005, (TR 54-56), and upon reconsideration on November 15, 2005.  TR 45-48, 50-53.

Powers filed a hearing request on December 21, 2005.  TR 31-32.  A hearing was held before an Administrative Law Judge ("ALJ") on June 11, 2008, and testimony was received from Powers, her mother, and a vocational expert ("VE") who

appeared at the ALJ's request. Powers was represented by counsel at the hearing. TR 242-62.

The ALJ's adverse decision was issued on June 26, 2008, (TR 24-30), and Powers' request for review by the Appeals Council was denied on December 4, 2008. TR 4-6. Powers' pending complaint for judicial review and reversal of the Commissioner's decision was timely filed on January 28, 2009. Filing No. 1.

## II. THE ALJ'S DECISION.

The ALJ evaluated Powers' claims through the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920, (TR 82-90), and found:

1. Powers met the insured status requirements of the Social Security Act through June 30, 2005.

2. Powers did not engage in substantial gainful activity at any time since December 1, 2003, the date she claims she became unable to work.

3. Powers has the following severe impairments: bipolar disorder, adult attention deficit disorder, obsessive compulsive disorder, and borderline personality disorder.

4. Powers does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. Based on the entire record, Powers has the residual functional capacity to perform heavy work as defined in 20 CFR 404.1567(c) and 416.967(c) and, with respect to mental performance, remains able to

        perform simple repetitive tasks; maintain attention, concentration, persistence, and pace; relate to and interact with others; adapt to usual changes in work settings; and adhere to safety rules.

6.     Powers is capable of performing her past relevant work as a café worker.

7.     Powers was not disabled, as that term is defined under the Social Security Act, from December 1, 2003 to the date of the ALJ's decision.

TR 26-30.

### III. ISSUES RAISED FOR JUDICIAL REVIEW.

Powers claims the ALJ's decision was incorrect because he failed to identify "good reasons" for discounting the opinions and ignoring the limitations imposed by Powers' treating psychiatrist, Dr. Rey de los Angeles and instead, relied upon a non-examining state agency psychological consultants' findings rendered almost three years prior to the hearing. Filing No. 17, at CM/ECF pp. 10-11.

### IV. THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

As of June 11, 2008, the date of the social security hearing, Powers was thirty-four years old, and a high school graduate. TR 246. She was able to speak, read, and understand English. TR 70. Her previous employment experience included working in a hospital cafeteria, (a medium, level 2 unskilled position), and as a sales associate for ShopKo, (a medium, level 3 semi-skilled position). TR 79, 259.

Powers first sought treatment from Reynaldo A. de los Angeles, M.D., a psychiatrist, on May 18, 2005. Powers reported a ten-year history of using drugs and alcohol, was addicted, and was withdrawing from four days of drinking alcohol and using methamphetamine. She blamed her sister for causing her ongoing problems, and throughout her therapy thereafter, consistently claimed her family was a root cause of her problems.

Powers, who received a month of inpatient addiction therapy at the Independence Center in Lincoln, Nebraska in 2002, did not want to be hospitalized. Dr. de los Angeles diagnosed Powers as having bipolar disorder, attention deficit disorder, alcohol dependence, methamphetamine dependence, and a borderline personality disorder, with a Global Assessment of Functioning ("GAF") score of 40 to 50. He prescribed Librium, vitamin $B_{12}$ and folic acid dietary supplements, Depakote, and Seroquel, and scheduled Powers to return in a week. TR 129-31, 123.

When Powers returned to see Dr. de los Angeles on May 24, 2005, she was reportedly feeling better, and was clear, coherent, oriented and interactive. She stated she was planning to change her cell phone number to avoid outside contact, and claimed she had remained sober and abstained from drug use since her last visit. Although Powers was experiencing nausea, Dr. de los Angeles continued her previously prescribed medications. TR 128. Powers returned to Dr. de los Angeles on May 31, 2005. She had reportedly staying sober, but she had not changed her cell phone number or returned to work.

During the first week of June 2005, Powers' father contacted Dr. de los Angeles and stated Powers was "drinking all night and sleeping all day." When Powers saw Dr. de los Angeles on June 7, 2005, she was angry at her parents because they were "monitoring her," and claimed her sister was a hypocrite because her sister's daughter had a baby and was a suspected methamphetamine addict. Powers stated she was cleaning her house, not working, and sleeping periodically. She was

crying and upset because she had no money, no job, and was not eating, and she believed others were to blame. Dr. de los Angeles noted Powers had bipolar disorder and a cognitive impairment, and continued her prescriptions. TR 126.

On June 13, 2005, Powers stated she was feeling better, and was still sober and abstaining from drug use, but she complained of mood swings. She claimed her father was putting her down and her niece (the alleged methamphetamine addict) was fighting her. Dr. de los Angeles noted Powers was clear and coherent, oriented and focused on goals. He continued her prescribed medications and referred her to counseling. TR 125.

Powers' counseling sessions with Joyce Forrest, M.S.W., began on June 14, 2005. TR 122. At that time, Powers was pulling weeds for her father and remained "on sabbatical" from her job at the family owned bar. She stated she "wants to live," and did not want to work at the bar due to anxiety, depression, and childhood issues. TR 122. When Powers returned for counseling on June 21, 2005, the counselor encouraged Powers to not return to work at the family bar while trying to maintain sobriety, and since Powers did not want to attend AA meetings due to low self-esteem and discomfort in groups, instructed Powers to purchase the books to begin a 12-step drug and alcohol therapy program during her counseling sessions. TR 115, 121. Powers returned to counseling a week later, and had not bought the 12-step workbook. Her speech was slurred and stuttered, and she lacked focus and recall. She stated she was looking for a different job, but had worked in the family bar, was still working in the "family's haying business," and she was "cutting weeds, etc." for her father. Powers stated she was filing a disability claim because she was unable to work and her parents were shouldering her expenses. TR 234.

Powers returned to counseling on June 28, 2005. She complained about her mother's continued pressure to have Powers work at the family bar, and disclosed a compulsive buying addiction with her mother's credit cards. The counselor noted that

although Powers appeared to have average intelligence and was able to locate and complete her social security disability application, she claimed she was unable to find the 12-step workbook at the bookstore. TR 119.

Powers failed to attend her next scheduled counseling appointment. When she returned on July 12, 2005, she claimed her mother had finally ordered the 12-step workbook which "should've been done several weeks ago." TR 118. The counselor discussed Powers' personal responsibility for her recovery and her procrastination. Powers was a "no show" for counseling on July 26, 2005, and was depressed when she attended her counseling appointment on August 2, 2005. Powers was encouraged to contact and enlist the help of "Donna" as a sponsor since Powers did not want to attend Alcoholics Anonymous meetings. TR 117-118.

When Powers saw Dr. de los Angeles on August 2, 2005, she said she had the 12-step book, but had not read it. TR 116. However, when she spoke with her counselor that same day, Powers claimed to have already completed the first three steps in her 12-step workbook. TR 117. On August 2, 2005, Powers told Dr. de los Angeles she had started drinking again, but stated he had not drank since July 27, 2005, because she did not have any money. TR 116. She did not report her relapse to her counselor until August 9, 2005 and, as of that date, she had still not contacted Donna to be a sponsor. Powers was again encouraged to contact Donna and was told to begin Step One in the workbook. TR 115, 232.

Powers had not started working on Step One when she returned on August 16, 2005, but did begin by August 23, 2005. TR 113-114. She was not working, but was doing yard work, reading, and using the computer. She was anxious and depressed, but claimed she had not drank alcohol for the last month. TR 112. Dr. de los Angeles' assessment indicated her alcoholism was "in remission." TR 112. Powers failed to attend her counseling appointment scheduled for August 30, 2005, because "it is tiring to talk" about addiction. TR 110.

Powers saw Dr. de los Angeles on September 9, 2005, and asked the doctor to explain her diagnosis. She was cooperative, gaining insight, coherent, oriented, and taking notes, and stated she was applying for disability, was planning, and did not want confrontation. TR 111. Powers' counseling record for September 13, 2005 states Powers appeared "quite mentally healthy lately," and neither paranoid nor delusional. TR 109. Powers missed several scheduled counseling appointments thereafter, and she was not seen again in September 2005. TR 233.

Powers counseling appointments on October 11 and October 18, 2005 focused on how to deal with her sister, who Powers claimed was manipulative, stole from her, and initiated fights. Powers did not attend her session on October 25, 2005, and as of November 2, 2005, was still reporting conflict with her sister and depression. Very little progress was being made on the 12-step program. TR 227-28. The counseling appointment on November 15, 2005 focused on Powers' continuing conflict with her sister and her sister's drug overdose; the November 22, 2005 appointments with Dr. de los Angeles and the counselor focused on Powers' preoccupation with her old boyfriend, her inability to stay on task when doing housework, and her fear of relapse if she spent the holidays with her family. TR 224-25.

On December 6, 2005, Powers told Dr. de los Angeles she was "doing well–now she's taking her meds– & much better." TR 221. She was "quite in control & motivated to do some work @ home," and was smiling, interactive, clear and able to express herself. The prescribed medications were continued. TR 221. Powers attended counseling on December 6, 2005, but called to re-schedule her appointments on December 13 and December 16, 2005.

When Powers saw Dr. de los Angeles and the counselor on December 20, 2005, she was clear, coherent, and interactive, but a little slow. She expressed concern over spending the holidays with her family and was going through the grief process over

past losses. TR 218-19. Her depression was reportedly improving by December 30, 2005. TR 216.

Powers advised her counselor on January 10, 2006 that she would not be attending her niece's wedding because it is difficult to be around the behaviors of her family members, including their drug and alcohol addictions, without relapsing. TR 215. Powers called her counselor on January 17, January 24, and January 26 2006, and stated she could not attend these scheduled sessions due to a strep infection. TR 213, 221. On February 7, 2006, she contacted both Dr. de los Angeles and the counselor and stated she had pneumonia. TR 212.

Powers was a "no show" for her appointment with the counselor on February 14, 2006, ( TR 212), but did attend her appointment with Dr. de los Angeles that day. Powers told Dr. de los Angeles that she went to Las Vegas and, while there, drank alcohol with her mother. TR 214. Powers did not attend her counseling appointments scheduled for February 21 and 23, 2006, and when she returned on February 28, 2006 after a seven-week hiatus, her appearance and attitude reflected a relapse in her progress. She stated she wanted to continue counseling and working on the 12-step program. TR 211.

Powers saw Dr. de los Angeles and the counselor on March 7, 2006. Dr. de los Angeles concluded Powers was in a dissociative state; the counselor noted Powers had regressed to the initial stages of her alcohol treatment. The counselor worked with Powers on a page of the 12-step workbook, noting Powers had not wanted to talk about her drug and alcohol addiction or work on the notebook for several months. TR 209. When Powers returned on March 14, 2006, Powers continued to complain about her family members, their issues, and her anger with them. She did not work on her 12-step workbook. TR 208. Powers worked on the 12-step program during counseling sessions on March 24 and March 28, 2006, stated she preferred to work

on the program with her counselor, and again expressed anger over her family members' ongoing drug and alcohol addictions. TR 205-07.

At her appointment with Dr. de los Angeles on April 4, 2006, Powers requested a letter in support of her request for food stamps. Dr. de los Angeles' record for that date stated Powers was "staying sober." TR 204. His letter dated April 18, 2006 stated Powers could not work due to Bipolar Disorder, Obsessive Compulsive Disorder, Adult Attention Deficit Disorder, and Borderline Personality Disorder, and remains on Strattera, Prozac, Librium, Lithium, and Restoril. TR 201.

Powers attended her counseling sessions fairly regularly from April 2006 through July 2006, was able to provide in-home care for her mother following the mother's knee replacement surgery, and planted trees. TR 190-91. The counseling sessions focused on her 12-step program, and controlling her anger with family members over their reported impositions upon and control over her life. However, by July 28, 2006, Powers was reporting memory lapses and was allowing male friends to stay at her house and smoke pot. TR 184. During August of 2006, Powers' condition deteriorated. She was scratching herself (self-mutilating) and began missing counseling appointments. TR 179-183.

Powers' last counseling session occurred on September 5, 2006. On that date, she reported she would again be caring for her mother following another knee replacement surgery. The counselor reminded Powers to regularly attend her appointments and work on her 12-step workbook to avoid relapse. TR 178. Powers skipped her session on September 11, 2006. She was reminded by telephone at least twice that she could not skip appointments. She made an appointment for September 29, 2006, but called on September 22, 2006 and said she no longer wanted to see the counselor. The counselor's receptionist "had to ask [Powers] to repeat what she was saying" because the receptionist could not understand Powers: "She sounded out of it. . . ." TR 176.

When Powers saw Dr. de los Angeles on October 3, 2006, she stated she was "drifting again." The doctor noted, "<u>using</u>?," but his diagnosis did not reflect drug and alcohol addiction. The doctor prescribed Ritalin. TR 174. Her ability to focus improved, but she began reporting symptoms of rage, delusions, and increased paranoia. Her Ritalin prescription was discontinued on February 2, 2007, but reinstated on March 23, 2007. TR 171-72. By April 10, 2007, Powers' Xanax prescription was increased from three times a day to four times a day.

By May 15, 2007, Powers was reportedly "out of Xanax" two weeks early. Her request for an early refill was denied. TR 165. Powers called Dr. de los Angeles on June 12, 2007, stating her house was broken into and her medications (including her Xanax) were stolen. The medications were refilled, but Dr. de los Angeles required Powers to file a police report for the stolen Xanax and Ritalin. TR 164. By July 31, 2007, Dr. de los Angeles was prescribing Xanax to be taken up to six times a day. TR 163. Powers called for a early refill of her Ritalin on August 3, 2007, because she was "out." She was told she needed to wait until it was time for a refill. TR 162. Powers got her Ritalin prescription filled on September 7, 2007, and tried to get another refill on September 18, 2007. The refill was refused. TR 161.

On October 16, 2007, Powers told Dr. de los Angeles her prescription medications had been in her purse, and her purse was stolen. The doctor noted her appearance was fair to poor and her insight was poor. The doctor's assessment was "ADD." TR 161. The Xanax prescription was increased, and all other prescriptions were continued on November 13, 2007. Powers had unsuccessfully attempted to alter her Ritalin prescription so she could receive an early refill. She was confronted by Dr. de los Angeles's office staff, and advised criminal charges could be filed. TR 159. When Powers called for an increase in her prescribed Xanax on November 27, 2007, she was told to "double up on it." TR 159.

In January of 2008, Powers told Dr. de los Angeles she was experiencing depression and racing thoughts, and she was not taking her Abilify and Prozac due to the expense. TR 158. She was better on February 1, 2008, and was reportedly taking her medications. By February 29, 2008, she was walking and exercising, sleeping well, and was clear and interactive, with fair insight, "brighter affect & better mood." TR 156. Powers was "doing okay," on March 18, 2008, and had been cleaning and helping her sister move back to their mother's home. TR 155. The doctor's report of May 13, 2008 noted Powers' disability hearing was scheduled for July 15, 2008. The doctor's medical record stated Powers was clear, coherent, oriented, and interactive, and had fair insight, further noting Powers "is growing up and away from chemicals and wrong crowds." TR 153.

Dr. de los Angeles' "Medical Source Statement" completed on June 6, 2008 states Powers had "[no] useful ability" to perform work-related functions due to "impaired emotional states and functioning–Has impaired insight and judgment to find or stay employed." TR 150. Dr. de los Angeles concluded Powers maintained a fair ability to understand, remember, and carry out very short and simple instructions; ask simple questions or request assistance; and adhere to basic standards of neatness and cleanliness. However, in every other respect listed on the checklist, Dr. de los Angeles found Powers had poor to no ability to perform the task. Specifically, he concluded she was unable or poorly able to maintain attention for two hours at a time; maintain regular attendance and be prompt; sustain an ordinary routine; function in coordination and with others; make simple decisions; complete a normal workday without psychological interruptions; function at a consistent pace; accept directions or respond appropriately to criticism; get along with others without causing or being a distraction; respond appropriately to changes in routine; deal with normal stress or the stress of semiskilled or skilled work; be aware of normal hazards and take appropriate precautions; understand, remember and carry out detailed instructions; set realistic goals; interact appropriately with the general public, use judgment, function independently, or maintain appropriate social behavior. TR 151-52.

Dr. de los Angeles's assessment was inconsistent with the Mental Residual Functional Capacity Assessment ("RFC") completed by a clinical psychologist on August 23, 2005. The psychologist noted that as of that time, Powers had admitted to using alcohol only a month earlier, and admitted she had not continued drinking thereafter only because she had no money. See TR 116. The history provided to the RFC evaluator contradicted some of the information provided to her doctor, and Powers was therefore "felt to be only partially credible." TR 105. The psychologist noted Powers had a ten-year history of dependance on methamphetamine, was unwilling to attend an organized chemical dependency treatment program, and was even reticent to buy the 12-step program book.

The psychologist concluded that even if Powers stopped using drugs and alcohol, due to her underlying ADD, Bipolar Disorder, and anxiety, she would still have a moderately limited ability to carry out detailed instructions; maintain attention and concentration; maintain regular attendance and be punctual; complete a normal work day at a consistent pace without interruption from psychological symptoms; interact appropriately with the general public; and accept instruction and respond appropriately to criticism. However, if not using drugs or alcohol, Powers remained able to remember locations and work-like procedures; understand, remember, and carry out simple instructions; understand and remember detailed instructions; sustain a routine without special supervision; work in proximity to others without causing or being a distraction; make simple work-related decisions; ask simple questions and request assistance; get along with coworkers and peers; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes and normal hazards in the work setting; and set realistic goals. TR 102-105.

At the social security hearing, Powers testified she no longer uses methamphetamine. She explained that despite her prescribed medications, she still has panic attacks, racing thoughts, mood swings, and difficulty concentrating,

remembering, communicating, and sleeping. TR 245-51. She testified she lives by herself, her daily activities include reading and taking care of several dogs and cats, and she enjoys movies and attends Bible study. TR 251-3. She stated her parents pay her bills, buy her groceries, and drive her to appointments. TR 253. She testified that her medications are renewed when she attends her appointments with Dr. de los Angeles, which last about an hour and focus on developing coping skills. TR 253-54.

Powers and her mother both testified that Powers can feel fine and interact appropriately one minute, and for no apparent reason, suddenly be angry or completely withdrawn the next. TR 255-56. Powers' mother testified Powers cannot buy her own groceries because once she enters the store, she cannot remember what to do or buy. TR 257. Powers' mother stated Powers only spends time with her family, and has too much anxiety in public to be employed. TR 257.

The ALJ asked the VE if Powers could perform her past relevant work as a sales associate or cafeteria worker assuming she had no physical restrictions, and her mental restrictions were consistent with those identified in the consulting examiner's mental RFC report when Powers was not using drugs or alcohol. Assuming such facts, the VE testified Powers could return to her past relevant work. However, the VE testified Powers could not return to past work or any job in the national economy if her restrictions included those identified in the mental RFC when Powers is using drugs or alcohol, and Powers could not work if the restricted as set forth in Dr. de los Angeles' Medical Source Statement. TR 259-62.

## V. ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision. A denial of benefits by the Commissioner is reviewed to

determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed. Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. Wildman v. Astrue, 2010 WL 760240, 2 (8th Cir. March 8, 2010).

Powers claims the ALJ erred by failing to rely on, or state "good reasons" for not crediting, the Medical Source Statement of Dr. de los Angeles. The ALJ must determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995). Before the ALJ determines an applicant's RFC, "the ALJ must determine the applicant's credibility, as [her] subjective complaints play a role in assessing [her] RFC." Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005). See also, Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility."). A treating physician's opinion is generally entitled to substantial weight in assessing a claimant's RFC, and must be accorded controlling weight under the regulations if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. Wildman, 2010 WL 760240 at *2. The regulations

require the adjudicator to cite "good reasons" in the notice of the determination or decision for the weight given to a treating source's medical opinion. 20 C.F.R. § 404.1527(d)(2). However, an ALJ "is not required to discuss every piece of evidence submitted," and his "failure to cite specific evidence [in the decision] does not indicate that such evidence was not considered." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

The ALJ's opinion thoroughly recites the restrictions described in Dr. de los Angeles' Medical Source Statement, (TR 28), but the ALJ concluded "the claimant's treatment records depict an entirely different situation than that described by the claimant, her mother, and her psychiatrist." In support of his decision, the ALJ cited to Powers' medical records and noted Powers had improved substantially within a few months after May of 2005, when she began treatment for both her underlying mental health problems and her methamphetamine and alcohol addiction. Specifically, beginning in late-June, 2005, Powers was able to perform a variety of activities such as pulling weeds in the family's haying business, doing errands for her sister, performing yard work, and house-painting; as of September 2005, the counselor reported Powers "appeared quite mentally healthy;" and by December 2005, Dr. de los Angeles' records noted Powers was doing much better on medication and "has been quite in control and motivated to do some work at home," and the counselor stated Powers' depression was lifting and she was able to do things and take care of herself. TR 28. The ALJ's opinion explains that although Powers relapsed by using alcohol in February 2006, the March 2006 counseling records stated Powers appeared and was reportedly feeling good, healthy, and happy. TR 28.

As the ALJ's decision outlines, Powers was still reportedly feeling good and like a "different person" in June of 2006, but during the fall of 2006 and early 2007, Dr. de los Angeles was questioning whether Powers was again using drugs or alcohol because her condition had drastically deteriorated. The ALJ opinion noted Dr. de los Angeles suspected Powers was experiencing drug-induced delusions in February

2007. TR 29. As described in the ALJ's opinion, Powers' records indicate she rebounded during the spring and summer of 2007, became worse when she stopped taking her prescribed medications in January 2008, but was again better when she resumed taking her medications. TR 29. Citing to Dr. de los Angeles' records, the ALJ's opinion states:

> The most recent records indicate that in February 2008 she had started walking and exercising and displayed a brighter affect and better mood, in March 2008 she had been cleaning as her sister was moving back to their mother's house, and in May 2008 she was attending church and going to Bible study. The most recent progress note also describes her as "growing up and away from chemicals and wrong crowds."

TR 29.

As set forth in the ALJ's opinion, based on the foregoing summary of Powers' records, the ALJ gave "little weight to the testimony of the claimant and her mother and the opinions of Dr. de los Angeles." The ALJ explained:

> Dr. de los Angeles conveniently omits substance dependence as a diagnosis and opines that the claimant is unable to work . . . which I find neither accurate nor truthful. The claimant's medical records show that the treatment focus has been on drug and alcohol abuse with generally successful results. The claimant responded quickly to her initial treatment within a few months of beginning treatment in May 2005, and she remained stable until she began to regress around August 2006. Even though she discontinued seeing her therapist in September 2006, she was again in a generally stable condition by March or April 2007 which she has maintained to the present time. The claimant's reported activities throughout the period of treatment and the observations by her psychiatrist and therapist clearly demonstrate that the testimony and the medical opinion evidence greatly exaggerate her symptoms and limitations.

TR29. Upon review of the record as a whole, the ALJ concluded the record failed to support Dr. de los Angeles' claim that claimant's underlying mental impairments, as opposed to her relapse of using drugs and alcohol, were the cause of Powers' complaints of "marked" limitation in function or episodes of decompensation.

Instead, the ALJ credited the RFC of the consulting mental health examiner who concluded Powers did have some limitations in function related to underlying mental disorders, including ADD, Bipolar Disorder, and anxiety, but provided she abstained from using alcohol or non-prescribed drugs, Powers would have only a "mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation," as reflected in and supported by Powers' documented medical history. TR 29.

The ALJ's decision cites, in detail, his reasons for not crediting Dr. de los Angeles' Medical Source Statement, and the ALJ's reasoning is fully supported by the medical records. Powers' records indicate that Dr. de los Angeles himself suspected drug and alcohol use, and Powers was engaging in behavior indicative of such use,[1] during time frames when her mental state deteriorated. Dr. de los Angeles' failure to acknowledge or ascribe any of Powers' past problems as caused by Powers' addictive behavior undermined the credibility of Dr. de los Angeles' Medical Source Statement. Under such circumstances, the ALJ was not required to give controlling weight to Dr. de los Angeles' opinion. Wildman, 2010 WL 760240 at *3 (holding an ALJ was entitled to discount a treating physician's opinion where the claimant failed to abstain from using drugs and alcohol, and the treating physician did not take the claimant's noncompliance into account when formulating and expressing his opinions).

---

[1] For example, although not specifically cited in the ALJ's opinion, the record reflects that as of July 28, 2006, Powers was allowing men to stay at her house and smoke marijuana, (TR 184), and by August 2006 she was "self-mutilating."

Despite Powers' underlying mental health problems, Powers remains able to abstain from abusing alcohol and drugs, and she is able to take her medications as prescribed. See, Wildman, 2010 WL 760240 at *3 ("[T]here is little or no evidence expressly linking [Powers'] mental limitation to . . . repeated noncompliance."). Based on the record, when Powers takes her prescribed medications without abusing alcohol and drugs, she is able to walk, exercise, perform some work activities, and interact with others at church and during Bible study activities. In other words, although the consulting examiner's mental RFC evaluation was completed three years prior to the social security hearing, the results were consistent with Powers' medical records and documented performance thereafter.

An ALJ may exclude from the hypothetical question posed to the VE "any alleged impairments that [were] properly rejected as untrue or unsubstantiated." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). The ALJ's opinion explains why Dr. de los Angeles' opinions were discredited, and why the ALJ relied instead on the consulting examiner's opinions. Johnson, 240 F.3d at 1148 ("The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."); Goose v. Apfel, 238 F.3d 981, 984 (8th Cir. 2001) (a non-testifying, non-examining expert's opinion cannot be considered substantial evidence to defeat the decision of the ALJ which is supported by substantial evidence). Based on the limitations outlined in the consulting examiner's RFC, the VE testified Powers is able to return to her past employment as a café worker. Accordingly, the ALJ denied Powers' social security disability claim.

The ALJ's decision will not be reversed for crediting the consulting examiner's RFC opinions, or for failing to fully credit or state good reasons for failing to credit, the opinions of Dr. de los Angeles. Upon review of the record as a whole, the court finds substantial evidence supporting the ALJ's decision.

Accordingly,

IT IS ORDERED that the findings and conclusions of the ALJ are affirmed.

Dated this 22nd day of March, 2010.

                BY THE COURT:

                *Richard G. Kopf*
                United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.